# **EXHIBIT 1**
[Proof of Claim]

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Ciena Capital Funding LLC f/k/a BLX Capital LLC | Case Number: 08-13786 (AJG) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br><br>Credit Suisse Securities (USA) LLC (in its individual capacity and as attorney in fact) | ☐ Check this box to indicate that this claim amends a previously filed claim.<br><br>Court Claim Number: _____<br>*(If known)* |
| Name and address where notices should be sent:<br><br>**Credit Suisse Securities (USA) LLC**<br>**11 Madison Avenue**<br>**New York, NY 10010**<br>**Attn: Robbin Conner, Esq.** *and*<br><br>10394 | **Chadbourne & Parke LLP**<br>**30 Rockefeller Plaza**<br>**New York, New York 10112**<br>**Attention: Joseph Smolinsky, Esq.**<br>          **Douglas Deutsch, Esq.**<br>**(212) 408-5100** | Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br>*See address for Credit Suisse Securities (USA) LLC above.* | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**      See attachment.<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim. |
| **2. Basis for Claim:** Money owed (see attached) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **3. Last four digits of any number by which creditor identifies debtor:** n/a<br><br>   **3a. Debtor may have scheduled account as:** _____<br>    (See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507 (a)(4). |
| **4. Secured Claim (See instruction #4 on reverse side.)** See attachment.<br><br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other<br>Describe:<br>Value of Property: $_____ Annual Interest Rate _____%<br>Amount of arrearage and other charges as of time case filed included in secured claim,<br>if any: $_____ Basis for perfection: _____<br>Amount of Secured Claim: $_____ Amount Unsecured: $_____ | ☐ Contributions to an employee benefit plan - 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507 (a)(7). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| **7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements.<br>You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest.<br>You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)* See attachment.<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain:. | ☐ Other - Specify applicable paragraph of 11 U.S.C. §507 (a)(__).<br><br>**Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| Date:<br><br>1/20/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>*[signature]* | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## Bryan J. Matthews
### Director

NY3 - 480564.03

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

### Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the bankruptcy debtor's name, and the bankruptcy case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is located at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the trustee or another party in interest files an objection to your claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). If the claim is based on the delivery of health care goods or services, see instruction 2. Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

_____**DEFINITIONS**_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity owed a debt by the debtor that arose on or before the date of the bankruptcy filing. See 11 U.S.C. §101 (10)

**Claim**
A claim is the creditor's right to receive payment on a debt owed by the debtor that arose on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's taxidentification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

---

_____**INFORMATION**_____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CIENA CAPITAL FUNDING LLC f/k/a., | ) Case No. 08-13786 (AJG) |
| BLX CAPITAL, LLC, *et al.,* | ) |
| | ) Jointly Administered |
| | ) |
| Debtor. | ) |

## ATTACHMENT TO THE PROOF OF CLAIM OF
## CIENA CAPITAL LLC F/K/A BUSINESS LOAN EXPRESS, LLC

This proof of claim (the "Proof of Claim") is filed in the bankruptcy case of Ciena

Capital Funding LLC f/k/a BLX Capital, LLC ("Ciena" or the "Debtor") (Case No. 08-13786), in

connection with the bankruptcy cases of Ciena and Ciena's affiliated debtors and debtors in

possession in the above referenced cases (collectively, "the Debtors"), by creditor Credit Suisse

Securities (USA) LLC ("Credit Suisse") in its individual capacity and on behalf of Wachovia

Capital Markets, LLC ("Wachovia") as attorney in fact. In support of this Proof of Claim, Credit

Suisse represents as follows:

## I.      Background

1.      On July 27, 2007, Credit Suisse, Wachovia and BB&T Capital Markets ("BB&T",

and together with Credit Suisse and Wachovia, each an "Initial Purchaser" and together, the

"Initial Purchasers"), entered into a certain purchase agreement with Ciena (the "Purchase

Agreement", attached hereto as **Exhibit A),** whereby the Initial Purchasers purchased from BLX

Capital LLC $378,400,000 of Class A Notes (the "Class A Notes"), $26,400,000 of Class B

Deferrable Interest Notes, $17,600,000 of Class C Deferrable Interest Notes and $17,600,000 of

Class D Deferrable Interest Notes issued by Business Loan Express Business Loan Trust 2007-A

for an aggregate total of $440,000,000. The proceeds of the notes were used to purchase business loans (the "Business Loans").

2.  Under Section 19 of the Purchase Agreement, if Class A Notes were retained by Credit Suisse on the Closing Date (as defined in the Purchase Agreement) (the "Retained Class A Notes"), Credit Suisse, on behalf of the Initial Purchasers, was to hold $721,000 of the proceeds from the sale of the Class A notes not retained (the "Retained Amount"). Section 19 further provides that upon subsequent sale of the Retained Class A Notes, the Retained Amount would be applied against any shortfall between the sales price for the Retained Class A Notes and the principal amount of such notes. If the Retained Amount was insufficient to pay the Initial Purchasers the full amount of the outstanding principal amount of the Retained Class A Notes, the Debtors were required to promptly pay the Initial Purchasers any such shortfall (the "Deficiency Amount").

3.  As of the Petition Date (as defined below), the Retained Class A Notes remained unsold.

4.  On September 30, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). Credit Suisse is now owed not less than $39,154,023.40 as set forth below.

## II.    Basis of Claim

7.  This claim is based on amounts owed by Ciena to Credit Suisse under the Purchase Agreement and is comprised of (i) the amount owed to Credit Suisse under Section 19

of the Purchase Agreement; (ii) reasonable fees, including attorneys' fees, recoverable by Credit Suisse under the terms of the Purchase Agreement; and (iii) other claims that may have arisen.

8.   *Deficiency Amount*.  As of the Petition Date, the outstanding face amount of the Class A Notes that were not sold by Credit Suisse or otherwise satisfied was $39,104,023.40.

9.   *Claim for Attorneys' Fees, Paralegal Fees and Court Costs*.  Pursuant to Section 2 of the Purchase Agreement, Credit Suisse may be entitled to recover the fess and disbursements of counsel to the Initial Purchasers ("Legal Fees and Costs").  Post-Petition Date, Credit Suisse incurred not less than an additional $50,000.00 in Legal Fees and Costs.

10.   *Continued Accrual*.  Credit Suisse continues to accrue Legal Fees and Costs in enforcing its rights under the Purchase Agreement.  Credit Suisse hereby reserves the right to assert additional claims for Legal Fees and Costs as incurred.

## III.   Amount of Claim

11.   Credit Suisse has an unsecured, liquidated claim against the Debtor in the amount of $39,154,023.40, plus accruing Legal Fees and Costs in an amount to be determined and any additional causes of action that may arise (collectively defined as the "Claim").

## IV.   Setoff and Counterclaim

12.   No judgment has been rendered on this Claim.  The amount of all payments on this Claim, if any, has been credited and deducted for the purpose of making this Proof of Claim.  This Claim is not subject to any known setoff or counterclaim, but Credit Suisse expressly reserves all rights of setoff.  However, to the extent any transaction between the Debtor and Credit Suisse are recharacterized, Credit Suisse reserves the right to exercise any and all setoff rights as appropriate.

3

## V. Reservation of Rights and/or Remedies

13.     This Proof of Claim is filed with full reservation of rights, including the right to file additional, supplementary and/or amended proofs of claim based on events, information and/or documents obtained from the Debtors or others through discovery or otherwise and with full reservation of the rights and/or claims of Credit Suisse against any party other than the Debtors or interests of Credit Suisse in any property including property of the estate. Specifically, Credit Suisse reserves its rights to assert claims against other affiliated entities of the Debtors under principles of law or equity.

14.     The filing of this Proof of Claim is not and shall not be deemed or construed as: (a) a waiver or release of Credit Suisse's rights against any person, entity, or property, or a waiver of the right to compel the Debtor to return property of Credit Suisse currently in the possession of the Debtor; (b) a consent by Credit Suisse to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Credit Suisse; (c) a waiver or release of Credit Suisse's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by Credit Suisse to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of Credit Suisse's rights to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a

4

waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving Credit Suisse; or (g) an election of remedies.

15.     This Proof of Claim is in addition to, and not in lieu of, any other proof of claim filed within these jointly administered cases.

## VI.   Notices

All notices and other pleadings relating to this Proof of Claim should be addressed as follows:

> Credit Suisse Securities (USA) LLC
> 11 Madison Avenue
> New York, NY 10010
> Attention: Robbin Conner, Esq.
> E-mail: robbin.conner@credit-suisse.com
>
> and
>
> Chadbourne & Parke LLP
> 30 Rockefeller Plaza
> New York, New York  10112
> Attention:  Joseph H. Smolinsky, Esq.
> E-mail: jsmolinsky@chadbourne.com
> Douglas Deutsch, Esq.
> Email: ddeutsch@chadbourne.com
> Phone: (212) 408-5100

## SPECIAL POWER OF ATTORNEY

To Wachovia Capital Markets, LLC

        The undersigned claimant hereby authorizes Credit Suisse Securities (USA) LLC as attorney in fact to prepare and file a proof of claim on behalf of Wachovia Capital Markets, LLC ("Wachovia") for a claim against Ciena Capital Funding LLC f/k/a BLX Capital LLC related to that certain Business Loan Express Loan Backed Notes, Series 2007-A Purchase Agreement dated July 27, 2007 (the "Purchase Agreement"), specifically limited to any and all claims that arise under Section 19 ("Purchase Price Adjustments") due Wachovia and any other "Initial Purchasers," as those terms are defined in the Purchase Agreement.

Dated: January 16, 2009

                    Signed:  Wachovia Capital Markets, LLC

                    By: _____ *Raj Shah* _____
                         Name: _____ Raj Shah _____
                         Title: _____ Managing Director _____

Acknowledged before me on January 16, 2009, by *M. Kahn Dupre*, who says that he is *a Managing Director* of Wachovia Capital Markets, LLC and is authorized to execute this power of attorney in its behalf.

# **EXHIBIT A**

**BUSINESS LOAN EXPRESS BUSINESS LOAN-BACKED NOTES,
SERIES 2007-A**

$ 378,400,000 **CLASS A NOTES**

$ 26,400,000 **CLASS B DEFERRABLE INTEREST NOTES**

$ 17,600,000 **CLASS C DEFERRABLE INTEREST NOTES**

$ 17,600,000 **CLASS D DEFERRABLE INTEREST NOTES**

**PURCHASE AGREEMENT**

July 27, 2007

Credit Suisse Securities (USA) LLC
11 Madison Avenue
New York, NY 10010

Wachovia Capital Markets, LLC
One Wachovia Center
301 South College Street, NCO600
Charlotte, NC 28288

BB&T Capital Markets
909 East Main Street
Richmond, VA 23219

Ladies and Gentlemen:

Section 1. <u>Authorization of Notes</u>. BLX Capital, LLC, a Delaware limited liability company ("BLX Capital" or the "Company") has duly authorized the sale of the Business Loan Express Business Loan-Backed Notes, Series 2007-A, Class A Notes (the "Class A Notes"), Class B Deferrable Interest Notes (the "Class B Notes"), Class C Deferrable Interest Notes (the "Class C Notes") and Class D Deferrable Interest Notes (the "Class D Notes" and together with the Class A Notes, Class B Notes and Class C Notes, the "Notes") of Business Loan Express Business Loan Trust 2007-A (the "Trust"). The Trust was formed pursuant to a Trust Agreement dated as of June 1, 2007 (the "Trust Agreement") between BLX Capital, as depositor, and U.S. Bank Trust National Association, as owner trustee (the "Owner Trustee"). The Class A Notes will be issued in an aggregate initial principal amount of $378,400,000, the Class B Notes will be issued in an aggregate initial principal amount of $26,400,000, the Class C Notes will be issued in an aggregate initial principal amount of $17,600,000 and the Class D Notes will be issued in an aggregate initial principal amount of $17,600,000. In addition to the Notes, the Trust is issuing a class of Certificates (the "Certificates"). The Certificates will be transferred to and held by BLC Capital Funding, LLC ("Capital Funding"), a special purpose entity majority-owned by BLX Capital. The Certificates will be issued pursuant to the Trust

Agreement. The Notes will be issued pursuant to an indenture dated as of June 1, 2007 (the "Indenture") between the Trust and HSBC Bank USA, National Association, as indenture trustee (the "Indenture Trustee"). Pursuant to the Sale and Servicing Agreement dated as of June 1, 2007 (the "Sale and Servicing Agreement") among the Trust, Capital Funding, as a seller, BLX Conventional Funding Trust I ("Funding I"), as a seller, BLX Capital, as originator and servicer, the Indenture Trustee, and Lyon Financial Services, Inc. (d/b/a U.S. Bank Portfolio Services), as back-up servicer (the "Back-up Servicer"), Capital Funding and Funding I will sell, transfer and convey to the Trust, without recourse, all of their right, title and interest to receive payments and certain other amounts attributable to certain business loans (the "Business Loans"). Pursuant to the Indenture, as security for the indebtedness represented by the Notes, the Trust will pledge and grant to the Indenture Trustee a security interest in the Business Loans and its rights under the Sale and Servicing Agreement.

Capitalized terms used herein but not otherwise defined shall have the meanings set forth in Appendix A to the Sale and Servicing Agreement.

The Notes are to be offered and sold by means of a Private Placement Memorandum (including any amendments or supplements thereto, the "Memorandum") prepared by the Company in a transaction exempt from the registration requirements of Section 5 of the Securities Act of 1933, as amended (the "Securities Act"), including transactions made pursuant to Rule 144A under the Securities Act ("Rule 144A") and in offshore transactions pursuant to Regulation S under the Securities Act.

It is understood and agreed that nothing in this Purchase Agreement ("Purchase Agreement") shall prevent Credit Suisse Securities (USA) LLC ("CS"), Wachovia Capital Markets, LLC ("WCM"), BB&T Capital Markets, a division of Scott Stringfellow Inc. ("BB&T" and together with CS and WCM, each an "Initial Purchaser" and together, the "Initial Purchasers") or any of their respective affiliates, from entering into any agency agreements, underwriting agreements or other similar agreements governing the offer and sale of securities with any issuer or issuers of securities, and nothing contained herein shall be construed in any way as precluding or restricting either Initial Purchaser's right to sell or offer for sale any securities issued by any person, including securities similar to, or competing with, the Notes.

During the initial Interest Accrual Period, the Class A Notes shall bear interest at a rate equal to [___]% per annum, the Class B Notes shall bear interest at a rate equal to [___]% per annum, the Class C Notes shall bear interest at a rate equal to [___]% per annum and the Class D Notes shall bear interest at a rate equal to [___]% per annum. For each Interest Accrual Period thereafter, the Class A Notes shall bear interest at the then applicable LIBOR plus 0.40% per annum, the Class B Notes shall bear interest at the then applicable LIBOR plus 1.10% per annum, the Class C Notes shall bear interest at the then applicable LIBOR plus 2.15% per annum and the Class D Notes shall bear interest at the then applicable LIBOR plus 3.25% per annum.

The Company hereby agrees with you, as the Initial Purchasers, as follows:

Section 2. Purchase of Notes. Subject to the terms and conditions and in reliance upon the representations and warranties set forth herein, the Company, on behalf of the Trust, agrees to sell all of the Notes to the Initial Purchasers and each Initial Purchaser agrees to

purchase from the Company, on behalf of the Trust, the principal amount of the Notes for the purchase price set forth opposite its name as follows:

| Initial Purchaser | Principal Amount of Class A Notes | Principal Amount of Class B Notes | Principal Amount of Class C Notes | Principal Amount of Class D Notes | Aggregate Purchase Price |
|---|---|---|---|---|---|
| Credit Suisse Securities (USA) LLC | $ 189,200,000 | $ 13,200,000 | $ 8,800,000 | $ 8,800,000 | $ 220,000,000 |
| Wachovia Capital Markets, LLC | $ 189,200,000 | $ 13,200,000 | $ 8,800,000 | $ 8,800,000 | $ 220,000,000 |
| BB&T Capital Markets | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| Total | $ 378,400,000 | $ 26,400,000 | $ 17,600,000 | $ 17,600,000 | $ 440,000,000 |

In addition, whether or not the transaction contemplated hereby shall be consummated, the Company agrees to pay all other costs and expenses incident to the performance by the Company of its obligations hereunder and under the documents to be executed and delivered in connection with the offering, issuance, sale and delivery of the Notes (the "Documents"), including, without limitation or duplication, (i) the fees and disbursements of counsel to the Company; (ii) the fees and expenses of any trustees or custodian due to such trustees' or custodian's initial expenses incurred in connection with the issuance of the Notes and its counsel; (iii) the fees and expenses of any bank establishing and maintaining accounts on behalf of the holders of the Notes or in connection with the transaction; (iv) the fees and expenses of the accountants for the Company, including the fees for the "comfort letters" or "agreed-upon procedures letters" required by the Initial Purchasers, any rating agency or any purchaser in connection with the offering, sale, issuance and delivery of the Notes; (v) all expenses incurred in connection with the preparation and distribution of one or more preliminary and the final Memorandum and other disclosure materials prepared and distributed and all expenses incurred in connection with the preparation and distribution of the Documents; (vi) the fees charged by any securities rating agency for rating the Notes; (vii) the fees for any securities identification service for any CUSIP or similar identification number required by the purchasers or requested by either Initial Purchaser; (viii) the fees and disbursements of counsel to the Initial Purchasers; (ix) all expenses in connection with the qualification of the Notes for offering and sale under state securities laws, including the fees and disbursements of counsel and, if requested by either Initial Purchaser, the cost of the preparation and reproduction of any "blue sky" or legal investment memoranda; (x) any federal, state or local taxes, registration or filing fees (including Uniform Commercial Code financing statements) or other similar payments to any federal, state or local governmental authority in connection with the offering, sale, issuance and delivery of the Notes; and (xi) subject to the prior approval of the Company, the reasonable fees and expenses of any special counsel or other experts required to be retained to provide advice, opinions or assistance in connection with the offering, issuance, sale and delivery of the Notes.

3

Section 3. <u>Delivery</u>. Delivery of the Notes shall be made in the form of one or more global certificates delivered to the Indenture Trustee, as custodian for The Depository Trust Company at the offices of Stroock & Stroock & Lavan LLP, New York, New York at 10:00 a.m. New York City time, on August 8, 2007, or such other place, time or date as may be mutually agreed upon by the Initial Purchasers and the Company (the "Closing Date"). Subject to the foregoing, the Notes will be registered in such names and such denominations as the Initial Purchasers shall specify in writing to the Company and the Indenture Trustee.

Section 4. <u>Representations and Warranties of the Company</u>. The Company represents and warrants to the Initial Purchasers, as of the Closing Date, that:

(i)     The Memorandum does not and will not, and any amendments thereof or supplements thereto and any additional information and documents concerning the Notes delivered by or on behalf of the Company to prospective purchasers of the Notes (collectively, such information and documents, the "Additional Offering Documents"), and any oral statements made by the Company to any prospective purchaser of the Notes did not or will not, each as of its issue date or date on which such statement was made, at the "time of sale" (as such term is used within the meaning of Rule 159 under the Securities Act) for the first sale of the Notes by the Initial Purchasers, and as of the Closing Date, include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading. The Additional Offering Documents shall include, without limitation (i) the Preliminary Private Placement Memorandum dated July 11, 2007, as supplemented by the Term Sheet, dated July 26, 2007, (ii) the Excel file commonly known as the "loan tape" providing detailed information on the Business Loans, (iii) the tables describing certain characteristics of the Business Loans, (iv) the yield, maturity and prepayment tables and weighted average life tables, (v) the default break even calculations and (vi) the CDI file, in each case in the form delivered by the Company to potential investors in the Notes or approved by the Company for delivery by the Initial Purchasers to potential investors in the Notes.

(ii)     The Company is a Delaware limited liability company, duly organized and validly existing under the laws of the state of Delaware, has all power and authority necessary to own or hold its properties and conduct its business in which it is engaged as described in the Memorandum and has all licenses necessary to carry on its business as it is now being conducted and is licensed and qualified in each jurisdiction in which the conduct of its business (including without limitation the originating and acquiring of Business Loans and performing its obligations hereunder and under the Basic Documents) requires such licensing or qualification.

(iii)     This Agreement has been duly authorized, executed and delivered by the Company, and, assuming due authorization, execution and delivery thereof by the Initial Purchasers, constitutes a valid and legally binding obligation of the Company enforceable against the Company in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally or the application of equitable principles in any proceeding, whether at law or in equity.

4

(iv)     The Business Loan Sale Agreements, the Trust Agreement and the Sale and Servicing Agreement have been duly authorized, executed and delivered by the Company and, assuming due authorization, execution and delivery thereof by the other parties thereto, constitute valid and binding agreements of the Company, enforceable against the Company in accordance with their respective terms, subject to the effect of bankruptcy, insolvency, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally or the application of equitable principles in any proceeding, whether at law or in equity.

(v)     When executed, authenticated and delivered in accordance with the Indenture and paid for by the purchasers thereof, the Notes will have been duly executed, authenticated, issued and delivered and will be entitled to the benefits of the Indenture.

(vi)     Other than as set forth in or contemplated by the Memorandum, there are no legal or governmental proceedings pending to which the Company is a party or of which any property or assets of the Company are the subject of which, if determined adversely to the Company, would individually or in the aggregate have a material adverse effect on the financial position, members' equity or results of operations of the Company or on the performance by the Company of its obligations hereunder or under the Basic Documents; and, to the best knowledge of the Company, no such proceedings are threatened or contemplated by governmental authorities or threatened by others.

(vii)     The execution, delivery and performance of this Agreement and the Basic Documents to which it is a party by the Company and the consummation by the Company of the transactions contemplated herein and therein and in all documents relating to the Notes will not result in any breach or violation of, or constitute a default under, any agreement or instrument to which the Company is a party or to which any of its properties or assets are subject, except for such of the foregoing as to which relevant waivers or amendments have been obtained and are in full force and effect, nor will any such action result in a violation of the certificate of formation or limited liability company agreement of the Company or any law or any order, decree, rule or regulation of any court or governmental agency having jurisdiction over the Company or its properties and no consent, authorization or order of, or filing or registration with, any court or governmental agency is required for the issuance and sale of the Notes or the execution, delivery and performance by the Company of this Agreement or the Basic Documents to which it is a party, except such consents, approvals, authorizations, registrations or qualifications as have been obtained or as may be required under state securities or blue sky laws in connection with the sale and delivery of the Notes in the manner contemplated herein.

(viii)     The Trust is not an "investment company" or an entity "controlled" by an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended.

(ix)     Assuming each of the Initial Purchaser's representations are true and accurate, it is not necessary in connection with the offer, sale and delivery of the

5

Notes in the manner contemplated by this Agreement and the Memorandum to register the Notes under the Securities Act.

(x)     The Notes satisfy the requirements set forth in Rule 144A(d)(3) under the Securities Act.

(xi)     At the time of execution and delivery of the Basic Documents, Capital Funding and Funding I, as applicable, owned each of the Business Loans free and clear of all liens, encumbrances, adverse claims or security interests ("Liens") and both Capital Funding and Funding I had the power and authority to transfer the applicable Business Loans to the Trust pursuant to the Sale and Servicing Agreement.

(xii)     Upon the execution and delivery of the Basic Documents, payment by the Initial Purchasers for the Notes and delivery to the Initial Purchasers of the Notes, the Trust will own the Business Loans and the Initial Purchasers will acquire title to the Notes, in each case free of Liens except such Liens as may be created or granted by the Initial Purchasers and those listed in the Basic Documents.

(xiii)     No consent, authorization or order of, or filing or registration with, any court or governmental agency is required for the issuance and sale of the Notes or the execution, delivery and performance by the Company of this Agreement or the Basic Documents, to which it is a party, except such consents, approvals, authorizations, registrations or qualifications as have been obtained or as may be required under state securities or blue sky laws in connection with the sale and delivery of the Notes in the manner contemplated herein.

(xiv)     The Business Loans, individually and in the aggregate, have the characteristics described in the Memorandum and the Additional Offering Documents.

(xv)     Each of the representations and warranties of the Company, Capital Funding and Funding I set forth in the Sale and Servicing Agreement is true and correct in all material respects.

(xvi)     Any taxes, fees and other governmental charges in connection with the execution, delivery and issuance of this Agreement and the Basic Documents and the Notes have been or will be paid by the Company prior to the Closing Date.

(xvii)     No adverse selection procedures were used in selecting the Business Loans from among the loans that meet the representations and warranties of the Company contained in the Sale and Servicing Agreement and that are included in the portfolio of the Company, Capital Funding or Funding I.

(xviii) Neither the Company nor any affiliate thereof nor anyone acting on their behalf has, directly or indirectly (except to or through the Initial Purchasers), sold or offered, or attempted to offer or sell, or solicited any offers to buy, or otherwise approached or negotiated in respect of, any of the Notes and neither the Company nor any of its affiliates will do any of the foregoing. As used herein, the terms "offer" and "sale" have the meanings specified in Section 2(3) of the Securities Act.

6

(xix)    Neither the Company nor any affiliate (as defined in Rule 501(b) of Regulation D under the Securities Act ("Regulation D")) of the Company has directly, or through any agent, sold, offered for sale, solicited offers to buy or otherwise negotiated in respect of, any security (as defined in the Securities Act) which is or will be integrated with the sale of the Notes in a manner that would require the registration under the Securities Act of the offerings contemplated by the Memorandum or engaged in any form of general solicitation or general advertising in connection with the offerings of the Notes.

(xx)    With respect to any Notes subject to the provisions of Regulation S of the Securities Act, the Company has not offered or sold such Notes during the Restricted Period to a person (other than each of the Initial Purchasers) who is within the United States or its possessions or to a United States person. For this purpose, the terms "Restricted Period", "United States or its possessions" and "United States person" are defined as such terms are defined for purposes of Treas. Reg. § 1.163-5(c)(2)(i)(D).

(xxi)    The Indenture is not required to be qualified under the Trust Indenture Act of 1939, as amended.

Section 5. Sale of Notes to the Initial Purchasers.  The sale of the Notes to the Initial Purchasers will be made without registration of the Notes under the Securities Act, in reliance upon the exemption therefrom provided by Section 4(2) of the Securities Act.

(a)    The Company and the Initial Purchasers each agree that the Notes will be offered and sold only in transactions exempt from registration under the Securities Act. The Company and the Initial Purchasers will each reasonably believe at the time of any sale of the Notes by the Company through the Initial Purchasers, as initial purchasers, (i) that either (A) each purchaser of the Notes is an institutional investor that is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act (each, a "QIB") in transactions meeting the requirements of Rule 144A, or (B) the purchaser is acquiring the Notes in an offshore transaction meeting the requirements of Regulation S under the Securities Act, and (ii) that the offering of the Notes will be made in a manner it reasonably believes will enable the offer and sale of the Notes to be exempt from registration under state securities or Blue Sky laws; and each such party understands that no action has been taken to permit a public offering in any jurisdiction where action would be required for such purpose. The Company and the Initial Purchasers each further agree not to (i) engage in any activity that would constitute a public offering of the Notes within the meaning of Section 4(2) of the Securities Act or (ii) offer or sell the Notes by any form of general solicitation or general advertising (as those terms are used in Regulation D), including the methods described in Rule 502(c) of Regulation D, in connection with any offer or sale of the Notes.

(b)    Each Initial Purchaser hereby represents and warrants to and agrees with the Company, as to itself only, that (i) such Initial Purchaser is an institutional "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act, and (ii) such Initial Purchaser will offer the Notes only (A) to persons who such Initial Purchaser reasonably believes are QIBs in transactions meeting the

7

requirements of Rule 144A or (B) in offshore transactions in reliance on Regulation S under the Securities Act. Each Initial Purchaser further agrees, as to itself only, that it will (i) deliver to each purchaser of the Notes, at or prior to the confirmation of sale, a copy of the Memorandum, as then amended or supplemented, which Memorandum will include a Notice to Investors in the form attached hereto as Exhibit H.

(c)     Each Initial Purchaser as to itself only hereby represents to the Company that it is a QIB.

(d)     Each Initial Purchaser hereby represents to the Company as to itself only that such Initial Purchaser is duly authorized and possesses the requisite corporate power to enter into this Agreement.

(e)     Each Initial Purchaser hereby represents to the Company as to itself only that there is no action, suit or proceeding pending against or, to the knowledge of such Initial Purchaser, threatened against or affecting, such Initial Purchaser before any court or arbitrator or any government body, agency, or official which could materially adversely affect the ability of such Initial Purchaser to perform its obligations under this Agreement.

(f)     Each Initial Purchaser represents to the Company as to itself only and agrees that all offers and sales of the Notes to non-United States persons by such Initial Purchaser, prior to the expiration of the Restricted Period, will be offered and sold only in accordance with the provisions of Rule 903 of Regulation S (except to the extent of any beneficial owners thereof who acquired an interest therein pursuant to another exemption from registration under the Securities Act and who will take delivery of a beneficial ownership interest in a Global Note, as contemplated in the Indenture) and only upon the receipt of the certification of beneficial ownership of the securities by a non-United States person in the form provided in the Indenture. For this purpose, the terms "Restricted Period" and "United States person" are defined as such terms are defined for purposes of Treas. Reg. §1.163-5(c)(2)(i)(D).

(g)     Each Initial Purchaser hereby represents to the Company as to itself only that it (i) has not offered or sold and, until six months after the Closing Date, will not offer or sell any Notes to persons in the United Kingdom except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995, as amended; (ii) has complied, and will comply, with all applicable provisions of the Financial Services Act 1986 of Great Britain and the Public Offers of Securities Regulations 1995, as amended, with respect to anything done by such Initial Purchaser in relation to the Notes in, from or otherwise involving the United Kingdom; (iii) only issued or passed on, and will only issue or pass on, in the United Kingdom any document received by such Initial Purchaser in connection with the proposed issue of the Notes to a person who is of a kind described in Article 11(3) of the Financial Services Act 1986

8

(Investment Advertisements) (Exemptions) Order 1996, as amended, or a person to whom the document may otherwise lawfully be issued or passed on.

(h)     Each Initial Purchaser represents to the Company as to itself only and agrees that, if it is an authorized person under Chapter III of Part I of the Financial Services Act of 1986 of the United Kingdom ("FSA"), it has only promoted and will only promote the Trust described in the Memorandum (whether by the issuing or passing on of documents as referred to in the foregoing restriction or otherwise) as an authorized person under Chapter III of FSA to a person in the United Kingdom if that person is of a kind described in Section 76(2) of the FSA or as permitted by the Financial Services (Promotion of Unregulated Schemes) Regulation 1991 (as amended).

Section 6. <u>Certain Agreements of the Company</u>. The Company covenants and agrees with the Initial Purchasers as follows:

(a)     If, at any time prior to the 90th day following the Closing Date, any event involving the Company shall occur as a result of which the Memorandum (as then amended or supplemented) would include an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the Company promptly will notify the Initial Purchasers and prepare and furnish to the Initial Purchasers an amendment or supplement to the Memorandum that will correct such statement or omission. The Company will not at any time amend or supplement the Memorandum (i) prior to having furnished the Initial Purchasers with a copy of the proposed form of the amendment or supplement and giving the Initial Purchasers a reasonable opportunity to review the same or (ii) in a manner to which the Initial Purchasers or their counsel shall reasonably object.

(b)     During the period referred to in Section 6(a), the Company will furnish to the Initial Purchasers, without charge, copies of the Memorandum (including all exhibits and documents incorporated by reference therein), the Basic Documents, and all amendments or supplements to such documents, in each case as soon as reasonably available and in such quantities as the Initial Purchasers may reasonably request.

(c)     At all times during the course of the private placement contemplated hereby and prior to the Closing Date, (i) the Company will make available to each offeree the Additional Offering Documents and information concerning any other relevant matters, as they or any of their affiliates possess or can acquire without unreasonable effort or expense, as determined in good faith by them, (ii) the Company will provide each offeree the opportunity to ask questions of, and receive answers from, them concerning the terms and conditions of the offering and to obtain any additional information, to the extent they or any of their affiliates possess such information or can acquire it without unreasonable effort or expense (as determined in good faith by them), necessary to verify the accuracy of the information furnished to the offeree, (iii) the Company will furnish the Initial Purchasers with copies of the Memorandum in such quantities as the Initial Purchasers may from time to time reasonably request, (iv) the Company will not publish or disseminate any material in connection with the offering of

9

the Notes except as contemplated herein or as consented to by the Initial Purchasers, (v) the Company will advise the Initial Purchasers promptly of the receipt by the Company of any communication from the Securities and Exchange Commission or any state securities authority concerning the offering or sale of the Notes, (vi) the Company will advise the Initial Purchasers promptly of the commencement of any lawsuit or proceeding to which the Company is a party relating to the offering or sale of the Notes, and (vii) the Company will advise the Initial Purchasers of the suspension of the qualification of the Notes for offering or sale in any jurisdiction, or the initiation or threat of any procedure for any such purpose.

(d)     While any Class of Notes remain outstanding, unless such Class has been registered, the Company will make available, upon request, to the Initial Purchasers, any holder and any prospective purchaser of such Notes, the information concerning the Company and the Notes specified in Rule 144A(d)(4) under the Securities Act.

(e)     Prior to the date of distribution of the Memorandum, the Company will provide the Initial Purchasers with a "comfort" or "agreed upon procedures" letter from Eisner LLP verifying the accuracy of such financial and statistical data contained in the Memorandum as the Initial Purchasers shall deem advisable.

(f)     Except as otherwise provided in the Indenture, each Note will contain a legend to the effect set forth in the form of Notice to Investors attached as Exhibit H hereto.

Section 7.  <u>Conditions of the Initial Purchasers' Obligations</u>.  The obligations of the Initial Purchasers to purchase the Notes on the Closing Date will be subject to the accuracy of the representations and warranties of the Company herein, to the performance by the Company of its obligations hereunder and to the following additional conditions precedent:

(a)     The Notes shall have been duly authorized, executed, authenticated, delivered and issued, the Basic Documents shall have been duly authorized, executed and delivered by the respective parties thereto and shall be in full force and effect, and the Business Loans shall have been delivered to the Indenture Trustee pursuant to the Sale and Servicing Agreement.

(b)     The Initial Purchasers shall receive a certificate, dated the Closing Date, of the President, Chief Executive Officer, Chief Financial Officer or any Executive or Senior Vice President of the Company to the effect that such officer has carefully examined this Agreement, the Memorandum and the Basic Documents and that, to the best of such officer's knowledge (i) since the date information is given in the Memorandum, there has not been any material adverse change in the condition, financial or otherwise, or in the earnings, results of operations, business affairs or business prospects of the Company, whether or not arising in the ordinary course of business, or the ability of the Company to perform its obligations hereunder or under the Basic Documents or in the characteristics of the Business Loans except as contemplated by the Memorandum or as described in such certificates, (ii) the representations and warranties of the Company set forth herein are true and correct as of the Closing Date, as though

10

such representations and warranties had been made on and as of such date, (iii) the Company has complied with all agreements and satisfied all conditions on its part to be performed or satisfied hereunder and under the Basic Documents, at or prior to the Closing Date, (iv) the representations and warranties of (A) the Company and Capital Funding in the Business Loan Sale Agreement, dated as of June 1, 2007, (B) the Company and Capital Funding in the Sale and Servicing Agreement and (C) the Company in the Trust Agreement are true and correct, as of the Closing Date, as though such representations and warranties had been made on and as of such date, and (v) nothing has come to the attention of such officer that would lead such officer to believe that the Memorandum, and any amendment thereof or supplement thereto, as of its date and as of the Closing Date, or any Additional Offering Document contains an untrue statement of a material fact or omits to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(c)     The Class A Notes shall have been rated no less than "AAA" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies ("S&P") and "Aaa" by Moody's Investors Service, Inc. ("Moody's"), the Class B Notes shall have been rated no less than "AA" by S&P and "Aa2" by Moody's, the Class C Notes shall have been rated "A" by S&P and "A2" by Moody's and the Class D Notes shall have been rated "BBB" by S&P and "Baa2" by Moody's, such ratings shall not have been rescinded, and no public announcement shall have been made by the respective rating agencies that the rating of the Notes have been placed under review.

(d)     On the date of the Memorandum, Ernst & Young LLP shall have furnished to the Initial Purchasers an "agreed upon procedures" letter, dated the date of delivery thereof, in form and substance satisfactory to the Initial Purchasers, with respect to certain financial and statistical information contained in the Memorandum.

(e)     The Company shall have furnished to the Initial Purchasers an opinion, dated the Closing Date, of Winston & Strawn LLP, counsel to the Indenture Trustee, substantially in the form attached hereto as Exhibit A.

(f)     The Initial Purchasers shall have received opinions of Stroock & Stroock & Lavan LLP, counsel to the Initial Purchasers, with respect to certain matters arising under New York law, substantially in the form attached hereto as Exhibit B.

(g)     The Initial Purchasers shall have received an opinion of Sutherland Asbill & Brennan LLP, counsel to the Company, (i) with respect to certain corporate, security interest, federal tax and securities law matters, substantially in the form attached hereto as Exhibit C and (ii) with respect to certain "true sale and non-consolidation" issues substantially in the forms attached hereto as Exhibit D.

(h)     The Initial Purchasers shall have received an opinion of Morris James LLP counsel to the Owner Trustee and the Trust, (i) substantially in the form attached hereto as Exhibit E and (ii) with respect to certain "trust issues" substantially in the form attached hereto as Exhibit F.

11

(i)     The Initial Purchasers shall have received an opinion of Chapman & Cutler LLP, counsel to the Back-up Servicer, substantially in the form attached hereto as Exhibit G.

(j)     The Initial Purchasers shall have received from the Indenture Trustee a certificate signed by one or more duly authorized officers of the Indenture Trustee, dated the Closing Date, in customary form.

(k)     The Initial Purchasers shall have received from the Back-up Servicer a certificate signed by one or more duly authorized officers of the Back-up Servicer, dated the Closing Date, in customary form.

(l)     The Initial Purchasers shall have received from the Owner Trustee, a certificate signed by one or more duly authorized officers of the Owner Trustee, dated the Closing Date, in customary form.

(m)     The Company shall have furnished to the Initial Purchasers and their counsel such further information, certificates and documents as the Initial Purchasers and their counsel may reasonably have requested, and all proceedings in connection with the transactions contemplated by this Agreement and all documents incident hereto shall be in all material respects reasonably satisfactory in form and substance to the Initial Purchasers and its counsel.

(n)     All documents incident hereto and to the Basic Documents shall be reasonably satisfactory in form and substance to the Initial Purchasers and their counsel, and the Initial Purchasers and their counsel shall have received such information, certificates and documents as they may reasonably request.

If any of the conditions specified in this Section 7 shall not have been fulfilled in all material respects when and as provided in this Agreement, or if any of the opinions and certificates mentioned above shall not be in all material respects reasonably satisfactory in form and substance to the Initial Purchasers, this Agreement and all of the Initial Purchasers' obligations hereunder may be canceled by the Initial Purchasers at or prior to delivery of and payment for the Notes.  Notice of such cancellation shall be given to the Company in writing, or by telephone or telecopy confirmed in writing.

Section 8.  Indemnification and Contribution.

(a)     The Company shall indemnify and hold harmless the Initial Purchasers and each person, if any, who controls either of the Initial Purchasers within the meaning of either the Securities Act or the Exchange Act from and against any loss, claim, damage or liability, joint or several, and any action in respect thereof, to which either Initial Purchaser or such controlling person may become subject, under the Securities Act or Exchange Act or otherwise, insofar as such loss, claim, damage, liability or action arises out of, or is based upon, any untrue statement or alleged untrue statement of a material fact contained in the Memorandum, any Additional Offering Document or any oral statement made by the Company to any prospective purchaser of the Notes or arises out of, or is based upon, the omission or alleged omission to state therein a material fact

12

required to be stated therein or necessary to make the statements therein not misleading, and shall reimburse each Initial Purchaser and such controlling person for any legal and other expenses reasonably incurred by either Initial Purchaser or such controlling person in investigating or defending or preparing to defend against any such loss, claim, damage, liability or action; provided, however, that the Company shall not be liable in any such case to an Initial Purchaser the extent that any such loss, claim, damage, liability or action arises out of, or is based upon, any untrue statement or alleged untrue statement or omission or alleged omission made in the Memorandum (i) in reliance upon and in conformity with written information furnished to the Company by such Initial Purchaser or on behalf of such Initial Purchaser specifically for inclusion therein and (ii) the mathematical calculations performed by the Initial Purchasers (but not the data or assumptions used to make such calculations by the Initial Purchasers, which the parties agree constitutes information of the Company) and used to derive the percentages, terms or dates in the yield, maturity and prepayment tables, weighted average life tables and default break even calculations included in the Additional Offering Documents. The foregoing indemnity is in addition to any liability that the Company may otherwise have to each Initial Purchaser or any person or entity controlling each Initial Purchaser. The Company acknowledges that the statements set forth in the Memorandum in the second to last paragraph on the cover page and the second and fifth paragraphs under the caption "Placement" constitute the only written information furnished to the Company by the Initial Purchasers or on behalf of the Initial Purchasers specifically for inclusion in the Memorandum or any Additional Offering Document.

(b)     Each Initial Purchaser shall severally and not jointly indemnify and hold harmless the Company and any person who controls the Company within the meaning of either the Securities Act or the Exchange Act from and against any loss, claim, damage or liability, joint or several, and any action in respect thereof, to which the Company or any such controlling person may become subject, under the Act or otherwise, insofar as such loss, claim, damage, liability or action arises out of, or is based upon, any untrue statement or alleged untrue statement of a material fact contained in the Memorandum or any Additional Offering Document or arises out of, or is based upon, the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, but in each case only to the extent that the untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company by such Initial Purchaser or on behalf of such Initial Purchaser specifically for inclusion therein, and shall reimburse the Company for any legal and other expenses reasonably incurred by the Company or any such controlling person investigating or defending or preparing to defend against any such loss, claim, damage, liability or action. The Company acknowledges that the statements set forth in the second to last paragraph on the cover page and the second and fifth paragraphs under the caption "Placement" in the Memorandum constitute the only written information furnished to the Company by the Initial Purchasers or on behalf of the Initial Purchasers specifically for inclusion in the Memorandum. The foregoing indemnity agreement is in addition to any liability that each Initial Purchaser may otherwise have to the Company or any of its controlling persons.

13

(c)     Promptly after receipt by an indemnified party under this Section 8 of notice of any claim or the commencement of any action, the indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under this Section 8, notify the indemnifying party in writing of the claim or commencement of that action, provided that the failure to notify the indemnifying party shall not relieve it from any liability that it may have to an indemnified party otherwise than under this Section 8, except to the extent that the indemnifying party has been materially prejudiced thereby. If any such claim or action shall be brought against an indemnified party, and it shall notify the indemnifying party thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it wishes, jointly with any other similarly notified indemnifying party, to assume the defense thereof with counsel reasonably satisfactory to the indemnified party. After notice from the indemnifying party to the indemnified party of its election to assume the defense of such claim or action, the indemnifying party shall not be liable to the indemnified party under this Section 8 for any legal or other expenses subsequently incurred by the indemnified party in connection with the defense thereof; provided that each Initial Purchaser shall have the right to employ counsel to represent such Initial Purchaser and the controlling persons who may be subject to liability arising out of any claim or action in respect of which indemnity may be sought by such Initial Purchaser against the Company under this Section 8, if (i) in the reasonable judgment of such Initial Purchaser, there may be legal defenses available to such Initial Purchaser, and those controlling persons, different from or in addition to those available to the Company, or there is a conflict of interest between such Initial Purchaser and the controlling persons, on one hand, and the Company, on the other, or (ii) the Company shall fail to select counsel reasonably satisfactory to the indemnified party or parties, and in such event the fees and expenses of such separate counsel shall be paid by the Company. In no event shall the Company be liable for the fees and expenses of more than one separate firm of attorneys for each Initial Purchaser and the controlling persons in connection with any other action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances.

(d)     If the indemnification provided for in Section 8 shall for any reason be unavailable to an indemnified party under Section 8(a) or 8(b) hereof in respect of any loss, claim, damage or liability, or any action in respect thereof, referred to therein, then each indemnifying party shall, in lieu of indemnifying such indemnified party, contribute to the amount paid or payable by such indemnified party as a result of such loss, claim, damage or liability, or action in respect thereof, (i) in such proportion as shall be appropriate to reflect the relative benefits received by the Company on the one hand and each Initial Purchaser on the other from the offering of the Notes or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Company on the one hand and each Initial Purchaser on the other with respect to the statements or omissions that resulted in such loss, claim, damage or liability, or action in respect thereof, as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and each Initial Purchaser on the other with respect to such offering shall be deemed to be in the same proportion as the total net proceeds from the offering of the Notes (before deducting

14

expenses) received by the Company bear to the total fees actually received by each Initial Purchaser with respect to such offering pursuant to Section 2 of this Agreement. The relative fault shall be determined by reference to whether the untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by the Company or either Initial Purchaser, the intent of the parties and their relative knowledge, access to information and opportunity to correct or prevent such statement or omission. The Company and the Initial Purchasers agree that it would not be just and equitable if contributions pursuant to this Section 8(d) were to be determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to herein. The amount paid or payable by an indemnified party as a result of the loss, claim, damage or liability, or action in respect thereof, referred to above in this Section 8(d) shall be deemed to include, for purposes of this Section 8(d), any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 8(d), no Initial Purchaser shall be required to contribute any amount in excess of the aggregate fee actually paid to such Initial Purchaser pursuant to Section 2 of this Agreement. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(e)     The indemnity agreements contained in this Section 8 shall survive the delivery of the Notes, and the provisions of this Section 8 shall remain in full force and effect, regardless of any termination or cancellation of this Agreement or any investigation made by or on behalf of any indemnified party.

Section 9. <u>Termination</u>. This Agreement shall be subject to termination in the absolute discretion of the Initial Purchasers, by notice given to the Company prior to delivery of and payment for the Notes, if prior to such time (i) trading in securities generally in the New York Stock Exchange shall have been suspended or materially limited or any setting of minimum prices for trading on such exchange has occurred, (ii) there has been, since the respective dates as of which information is given in the Memorandum, any material adverse change in the condition, financial or otherwise, or in the properties (including, without limitation, the Business Loans) or the earnings, business affairs or business prospects of the Company considered as one enterprise, whether or not arising in the ordinary course of business; (iii) a general moratorium on commercial banking activities in New York shall have been declared by either federal or New York State authorities, or (iv) there shall have occurred any material outbreak or escalation of hostilities or other calamity or crises the effect of which on the financial markets of the United States is such as to make it, in the reasonable judgment of either Initial Purchaser, impracticable or inadvisable to market the Notes on the terms and in the manner contemplated by the Memorandum as amended or supplemented.

Section 10. <u>Severability Clause</u>. Any part, provision, representation, or warranty of this Agreement which is prohibited or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

15

Section 11.Notices. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by overnight mail, certified mail or registered mail, postage prepaid and effective only upon receipt and if sent to WCM, will be delivered to Wachovia Capital Markets, LLC, One Wachovia Center, 301 South College Street, TW10, Charlotte, NC 28288, Attention: General Counsel (with a copy to the Asset Finance Group); if sent to CS, will be delivered to One Madison Avenue, New York, NY 10010, Attention: General Counsel of the Americas; if sent to BB&T, will be delivered to 909 East Main Street-8th Floor North, Richmond, VA 23219, Attention: William Hardy; or if sent to the Company will be delivered to BLX Capital, LLC, 1165 Main Street, Suite 220, East Hartford, Connecticut, Attention: Mr. Ted Horan.

Section 12.Default by One of the Initial Purchasers. If either of the Initial Purchasers shall fail on the Closing Date to purchase the Notes which it is obligated to purchase hereunder (the "Defaulted Notes"), the remaining Initial Purchaser (the "Non-Defaulting Initial Purchaser") shall have the right, but not the obligation, within one (1) Business Day thereafter, to make arrangements to purchase all, but not less than all, of the Defaulted Notes upon the terms herein set forth; if, however, the Non-Defaulting Initial Purchaser shall have not completed such arrangements within such one (1) Business Day period, then this Agreement shall terminate without liability on the part of the Non-Defaulting Initial Purchaser.

No action taken pursuant to this Section shall relieve any defaulting Initial Purchaser from liability in respect of its default.

Section 13.    Representations and Indemnities to Survive. The respective agreements, representations, warranties, indemnities and other statements of the Company and its officers, and of each Initial Purchaser set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation made by or on behalf of either Initial Purchaser, the Company or any of the controlling persons referred to in Section 8 of this Agreement, and will survive delivery of and payment for the Notes.

Section 14.    Absence of Fiduciary Relationship. The Company acknowledges and agrees that:

(a)    the Initial Purchasers have been retained solely to act as initial purchasers in connection with the sale of the Notes and agree with the Company that no fiduciary, advisory or agency relationship between the Company and the Initial Purchasers has been created in respect of any of the transactions contemplated by this Agreement, irrespective of whether the Initial Purchasers have advised or are advising the Company on other matters and further agree that the Initial Purchasers owe the Company only those duties and obligations set forth herein;

(b)    the price of the Notes set forth in this Agreement was established by the Company following discussions and arms-length negotiations with the Initial Purchasers and the Company is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated by this Agreement;

(c)    the Company has been advised that the Initial Purchasers and their affiliates are engaged in a broad range of transactions which may involve interests that differ from those of the

Company and that the Initial Purchasers have no obligation to disclose such interests and transactions to the Company by virtue of any fiduciary, advisory or agency relationship; and

(d)    the Company waives, to the fullest extent permitted by law, any claims it may have against the Initial Purchasers for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that the Initial Purchasers shall have no liability (whether direct or indirect) to the Company in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Company, including stockholders, employees or creditors of the Company.

Section 15.Successors.  This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers, directors and controlling persons referred to in Section 8 of this Agreement and their respective successors and assigns, and, except as specifically set forth herein, no other person will have any right or obligation hereunder.

Section 16.Applicable Law.  THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ITS CONFLICT OF LAW PROVISIONS.

Section 17.Counterparts, Etc.  This Agreement supersedes all prior or contemporaneous agreements and understandings relating to the subject matter hereof.  Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated except by a writing signed by the party against whom enforcement of such change, waiver, discharge or termination is sought.  This Agreement may be signed in any number of counterparts each of which shall be deemed an original, which taken together shall constitute one and the same instrument.

Section 18.Limitation of Liability.  Notwithstanding any other provision herein or elsewhere, this Agreement has been executed and delivered on behalf of the Trust by U.S. Bank Trust National Association, not in its individual capacity, but solely in its capacity as Owner Trustee of the Trust, in no event shall U.S. Bank Trust National Association or the Owner Trustee have any liability in respect of the representations, warranties, or obligations of the Trust hereunder or under any other document, as to all of which recourse shall be had solely to the assets of the Trust, and for all purposes of this Agreement and each other document, the Owner Trustee and U.S. Bank Trust National Association shall be entitled to the benefits of the Trust Agreement.

Section 19.Purchase Price Adjustments.  Notwithstanding any other provision herein or elsewhere, on the Closing Date, to the extent CS, on behalf of the Initial Purchasers, retains Class A Notes (the "Retained Class A Notes"), CS, on behalf of the Initial Purchasers, shall retain $721,000 of the proceeds from the sale of the Class A Notes not retained (the "Retained Amount").  If after the Closing Date the Initial Purchasers sell any of the Retained Class A Notes for a price less than the then outstanding principal amount thereof, the Initial Purchasers shall receive from the Retained Amount an amount equal to such difference.  If the Retained Amount is insufficient to pay the Initial Purchasers the full amount of such difference, the Company shall, promptly upon request of the Initial Purchasers, pay the Initial Purchasers

17

any such excess. The Initial Purchasers shall remit to the Company the portion, if any, of the Retained Amount remaining after the Initial Purchasers sell all the Retained Class A Notes.

[REST OF PAGE INTENTIONALLY LEFT BLANK]

If the foregoing is in accordance with your understanding of our agreement, please sign and return to the undersigned a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, the Trust and the Initial Purchasers.

Very truly yours,

BLX CAPITAL, LLC

By: _____

Name:          **Ted Horan**
Title:

**Vice President**

BUSINESS LOAN EXPRESS
BUSINESS LOAN TRUST 2007-A

By:     U.S. Bank Trust National Association, not in
        its individual capacity but solely as Owner
        Trustee on behalf of the Trust

By: _____

Name:
Title:

If the foregoing is in accordance with your understanding of our agreement, please sign and return to the undersigned a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, the Trust and the Initial Purchasers.

Very truly yours,

BLX CAPITAL, LLC

By: _____

Name:
Title:

BUSINESS LOAN EXPRESS
BUSINESS LOAN TRUST 2007-A

By:    U.S. Bank Trust National Association, not in its individual capacity but solely as Owner Trustee on behalf of the Trust

By:    *Nicole Poole*

Name:    **Nicole Poole**
Title:    **Vice President**

The foregoing Agreement is hereby confirmed and accepted as of the date first above written by:

CREDIT SUISSE SECURITIES (USA) LLC

By: _____
    Name: Russell G. Burns
    Title: Managing Director

WACHOVIA CAPITAL MARKETS, LLC

By: _____
    Name:
    Title:

BB&T CAPITAL MARKETS, A DIVISION OF SCOTT & STRINGFELLOW INC.

By: _____
    Name:
    Title:

The foregoing Agreement is hereby confirmed and
accepted as of the date first above written by:


CREDIT SUISSE SECURITIES (USA) LLC


By: _____
      Name:
      Title:

WACHOVIA CAPITAL MARKETS, LLC


By: _____
      Name: Mary Katherine DuBose
      Title: Managing Director

BB&T CAPITAL MARKETS, A DIVISION OF
SCOTT & STRINGFELLOW INC.


By: _____
      Name:
      Title:

The foregoing Agreement is hereby confirmed and
accepted as of the date first above written by:

CREDIT SUISSE SECURITIES (USA) LLC

By: _____
       Name:
       Title:

WACHOVIA CAPITAL MARKETS, LLC

By: _____
       Name:
       Title:

BB&T CAPITAL MARKETS, A DIVISION OF
SCOTT & STRINGFELLOW INC.

By: _____
       Name: William E. Hardy
       Title: Senior Managing Director